UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-24492-RNS

UNITED STATES OF AMERICA,

                Plaintiff,

v.

DORON a/k/a DON KRAMER,
and JOHN DOE and JANE DOE,
as potential heirs and/or personal
representatives and/or distributees, of
the ESTATE OF RICHARD KRAMER,

                Defendants.    /

**UNITED STATES OF AMERICA'S MOTION FOR ENTRY OF A
DEFAULT JUDGMENT AGAINST THE DEFENDANT DORON a/k/a DON KRAMER**

Pursuant to the Court's Order on Default Judgment Procedure entered on August 16, 2019 (*see* Doc. 45), Rule 55(b)(2) of the Federal Rules of Civil Procedure, Local Rule 7.1, and for the reasons described, below, the plaintiff, United States of America, respectfully moves this Court for entry of a default judgment against the defendant, Doron a/k/a Don Kramer ("Don"), in his capacity as a potential heir and/or personal representative of the estate of the decedent, Richard Kramer ("Richard"), and/or a distributee of Richard's property, in the sum of $1,010,322.68 for the civil penalties assessed against Richard under 31 U.S.C. § 5321(a)(5), including interest and failure to pay penalties under 31 U.S.C. § 3717, for the calendar years 2006, 2007 and 2008, plus interest, failure to pay penalties and other additional amounts, such as administrative costs, that have accrued and continue to accrue, as provided by law, from August 27, 2019 until the judgment is paid.[1]

---

[1]   The United States filed an Application for Entry of Default against the Defendant, Doron a/k/a Don Kramer, including the Declaration of Trial Attorney Lynne M. Murphy ("Decl. Murphy") and Exhibits "1" through "10," on March 29, 2019 (*see* Doc. 15) and renewed its Application for Entry of Default against the Defendant, Doron a/k/a Don Kramer, including the Supplemental

On October 26, 2018, the United States filed a complaint, *inter alia*, against Don, seeking to reduce to judgment the unpaid balance of the civil penalties assessed against his deceased brother, Richard, pursuant to 31 U.S.C. § 5321(a)(5), and accruals as provided by law. Despite having been properly served with a summons and a copy of the complaint, Don has not answered or otherwise responded to the plaintiff's complaint within the time limits prescribed by the Federal Rules of Civil Procedure or as ordered by the Court in its Order on Defendant' Motion To Set Aside Clerk's Default entered on June 13, 2019 (*see* Doc. 31, at p. 4). As a consequence and pursuant to Fed. R. Civ. P. 55(a), the Clerk of Court entered a default against Don on August 16, 2019 (*see* Doc. 44). The United States now moves the Court for entry of a default judgment against Don under Fed. R. Civ. P. 55(b)(2) and, for the reasons described, below, requests that the Court enter a default judgment in its favor and against the defendant, Doron a/k/a Don Kramer.

## I.   FACTUAL AND PROCEDURAL BACKGROUND.

### A.   FACTS.

The United States filed a complaint on October 26, 2018, to reduce to judgment the unpaid civil penalties assessed against the decedent, Richard Kramer, for his willful failure to report his interest in certain foreign financial accounts timely, as required by 31 U.S.C. § 5314 and its implementing regulations (the "FBAR penalty"), plus interest, failure to pay penalties and other additional amounts, such as administrative costs, that have accrued and continue to accrue as provided by law, from the date of assessment until paid. See Doc. 1.

### 1.   FBAR Reporting Requirements.

Section 5314 of Title 31 of the United States Code (U.S.C.) authorizes the Secretary of the Treasury to require United States citizens or residents ("U.S. persons") to file reports when they make a transaction or maintain a relationship for any person with a foreign financial agency. See

---

Declaration of Trial Attorney Lynne M. Murphy ("Supp. Decl. Murphy") and Exhibits "11" through "13," on August 16, 2019 (*see* Doc. 43). Rather than repeat the facts and arguments that the United States previously discussed in its applications, it refers to and incorporates the applications, including the accompanying declarations and exhibits, herein.

31 U.S.C. § 5314(a).  Under the implementing regulations of the statute, 31 U.S.C. § 5314, "[e]ach United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship" to the IRS "for each year in which such relationship exists . . . [on] a reporting form prescribed under 31 U.S.C. § 5314."  See 31 C.F.R. § 1010.350(a) (formerly, 31 C.F.R. § 103.24(a) (2010)).  To fulfill the reporting requirement imposed under 31 U.S.C. § 5314 for the calendar years 2006, 2007 and 2008, a U.S. person who had a financial interest in, or signature or other authority over, a foreign bank, securities, or other financial account was required to report the interest to the IRS by filing a Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts," commonly known as an "FBAR," by June 30 of the year following any calendar year in which the aggregate balance of such account(s) exceeded, at any time during that calendar year, $10,000.  See 31 C.F.R. §§ 1010.306(c) and 1010.350(a) (formerly, 31 C.F.R. §§ 103.24(a) and 103.27(c)(2010)).

**2.   Summary of Richard Kramer's Interest In Certain Foreign Financial Accounts.**

Before Richard died on February 18, 2017, he was a United States citizen and resided in Miami-Dade County, Florida.  See Doc. 1, at ¶¶ 4-5.  During 2006 through 2008, Richard had a financial interest in, and signature or other authority over, multiple financial accounts that he had established and maintained at UBS AG ("UBS") and Bank Julius Baer & Co., Ltd. ("Julius Baer").  See Doc. 1, at ¶¶ 14-64.

*a.   UBS Account No. 0118.*

On December 8, 2003, Richard, his father, Sigmund, and his two brothers, Don and Harold, (collectively, the "Kramers") opened a joint foreign account at UBS, and that account is referred to herein as Account No. 0118, to receive funds being transferred from an undisclosed UBS account, bearing Account No. 1773.[2]  See Doc. 1, at ¶¶ 22-29 and 31.  Sigmund, Richard, Don and Harold were identified as the beneficial owners of Account No. 0118.  See Doc. 1, at ¶ 30.  Richard

---

[2]   Account No. 1773 was held in the name of Sigmund Kramer, although Richard held a full power of attorney, with power of substitution.  See Doc. 1, at ¶¶ 24-25.

traveled to Switzerland to open Account No. 0118 in person.  <u>See</u> Doc. 1, at ¶ 29.  No Forms 1099 were issued for the account.  <u>See</u> Doc. 1, at ¶ 35.

When Sigmund died on August 27, 2005, the value of the assets in Account No. 0118 totaled approximately $6.1 million.  <u>See</u> Doc. 1, at ¶ 37.  Although Richard and his two brothers, Don and Harold, served as co-executors of their father's estate, the account was not reported on Sigmund's estate tax return.  <u>See</u> Doc. 1, at ¶ 37.  On June 9, 2006, after Sigmund's death, Richard, Don and Harold (collectively, the "Kramer brothers") executed an Asset Management Agreement for UBS Account No. 0118, indicating, *inter alia*, that each brother held a one-third interest in the account.  <u>See</u> Doc. 1, at ¶ 38.  By letter dated February 15, 2007, the Kramer brothers advised UBS to close Account No. 0118 and "split the funds equally into three separate [i]ndividual accounts." <u>See</u> Doc. 1, at ¶ 39.  Prior to distribution of the assets of the account to the brothers' separate accounts in 2007, Account No. 0118 had a balance of approximately $7.3 million.  <u>See</u> Doc. 1, at ¶ 39.  <u>See also</u>, pp. 4-5, *infra*, and Doc. 1, at ¶¶ 42-53, for discussion regarding Richard's UBS Account No. 0167.

After distributing most of the account's assets to the Kramer brothers, Account No. 0118 maintained a minimal balance until it was closed in 2009.  <u>See</u> Doc. 1, at ¶ 40.  For the calendar years 2006, 2007 and 2008, the account balance of Account No. 0118 as of June 30, 2007, 2008 and 2009 was $7,320,538, $361 and $0, respectively.  <u>See</u> Doc. 1, at ¶ 41.  Richard's one-third share of the account balances, above, totaled $2,440,179, $120, and $0.  <u>See</u> Doc. 1, at ¶ 41.

### b. *UBS Account No. 0167.*

On December 12, 2006, Richard opened UBS Account No. 0167 to receive the 2007 distribution of his one-third interest in the assets held in Account No. 0118.  <u>See</u> Doc. 1, at ¶ 42. <u>See also</u>, Doc. 1, at ¶¶ 38-39 and 42; pp. 3-4, *supra*, for discussion regarding UBS Account No. 0118.  Richard was identified as the accountholder of Account No. 0167, and the sole beneficial owner of the assets and income held in that account.  <u>See</u> Doc. 1, at ¶ 43.  After receiving the

deposit from Account No. 0118 in 2007, Account No. 0167 had an account balance of approximately $2.3 million. <u>See</u> Doc. 1, at ¶ 44. No Forms 1099 were issued for Account No. 0167, and neither Richard's name nor his address appeared on the account statements. <u>See</u> Doc. 1, at ¶ 50.

In September 2008, UBS notified Richard, in writing, that it would "cease providing cross-border services to its U.S.-domiciled private clients" and requested that he close Account Nos. 0118 and 0167 by October 30, 2008. <u>See</u> Doc. 1, at ¶ 51. UBS also suggested that Richard "consult with [his] U.S. tax advisor or tax preparer to file, if necessary, amended U.S. tax returns pursuant to IRS's Voluntary Disclosure program." <u>See</u> Doc. 1, at ¶¶ 51 and 69. In response to UBS's notice and by letter dated October 15, 2008, Richard requested that UBS transfer all assets held in Account No. 0167, to an account that he had opened at Julius Baer in Zurich, bearing Account No. 2669. <u>See</u> Doc. 1, at ¶¶ 51-52. <u>See also</u>, Doc. 1, at ¶¶ 58-59; p. 6, *infra*, for discussion regarding Julius Baer Account No. 2669.

Before the end of 2008, UBS transferred the bulk of the assets held in Account No. 0167, to Richard's Julius Baer Account No. 2669. <u>See</u> Doc. 1, at ¶¶ 52 and 58-59. As a consequence, Account No. 0167 had a minimal account balance of approximately $23,000 on December 31, 2008, and until its closure in January 2009. <u>See</u> Doc. 1, at ¶ 52. For the calendar years 2007 and 2008, the account balance of Account No. 0167 as of June 30, 2008 and 2009 was $1,686,528 and $0, respectively. <u>See</u> Doc. 1, at ¶ 53.

### c.   *UBS Account No. 1253.*

Account No. 1253 was established at UBS before 2005, and Richard was the sole beneficial owner of the assets and income held in the account during 2007 and 2008. <u>See</u> Doc. 1, at ¶ 54. In or around March 2007, Richard received a distribution of one-third of the assets held in UBS Account No. 4830, known as the "Kramer Corp. account," and he arranged for those assets to be transferred to UBS Account No. 1253. <u>See</u> Doc. 1, at ¶ 55. <u>See also</u>, Doc. 1, at ¶¶ 20-21 for

discussion regarding UBS Account No. 4830.  Before UBS transferred the assets from Account No. 4830, to Account No. 1253, Kramer Corp. had already disclosed the assets to the U.S. authorities.  See Doc. 1, at ¶ 21.  Richard closed Account No. 1253 in 2008, and instructed that the assets be transferred to his domestic accounts.  See Doc. 1, at ¶ 55.  Forms 1099 for Account No. 1253 were issued to Richard for 2007 and 2008.  See Doc. 1, at ¶ 56.  For the calendar years 2007 and 2008, the account balance of Account No. 1253 on June 30, 2008 and 2009 was $0 and $0, respectively.  See Doc. 1, at ¶ 57.

> **d.  *Julius Baer Account No. 2669.***

In 2008, Richard opened Account No. 2669 with Julius Baer in Zurich, and he was the sole beneficial owner of the assets and income held in the account.  See Doc. 1, at ¶ 58.  In October 2008, Richard instructed UBS to transfer all assets held in his UBS Account No. 0167, to Account No. 2669.  See Doc. 1, at ¶¶ 52 and 59; pp. 4-5, *supra*, for discussion regarding UBS Account No. 0167.  After the transfer, Account No. 2669 had an account balance of approximately $1.3 million.  See Doc. 1, at ¶ 59.  Richard maintained Account No. 2669 until 2011.  See Doc. 1, at ¶ 59.  No Forms 1099 were issued for 2008 and 2009, but a Form 1099 was issued for 2010.  See Doc. 1, at ¶ 62.  For the calendar year 2008, the account balance of Account No. 2669 as of June 30, 2009 totaled $1,302,636.  See Doc. 1, at ¶ 63.

**3.  <u>The Management and Operations of the UBS and Julius Baer Accounts</u>**.

Richard actively participated in the management of the accounts that he established and maintained at UBS and Julius Baer.  He personally opened the accounts, communicated with the bank advisors, and directed how his account assets were to be invested.  He established and maintained the accounts as "numbered" accounts, and not "named" accounts.  See e.g., Doc. 1, at ¶¶ 36, 50 and 61.  Neither Richard's name nor his address appeared on the account statements.  See Doc. 1, at ¶¶ 36, 50 and 61.

With regard to UBS Account Nos. 0118 and 0167, as well as Julius Baer Account No. 2669, Richard instructed the banks, in writing, to retain all account statements and other

communications for a fee.  See Doc. 1, at ¶¶ 32, 45 and 60.  Richard also directed UBS, in writing, that, after he instructs UBS, the bank is to use all or part of the funds available in Account Nos. 0118 and 0167 to make investments on a fiduciary basis in the name of UBS, but for his account and at his risk.  See Doc. 1, at ¶¶ 33 and 46.  In 2006, Richard executed an Asset Management Agreement for Account Nos. 0118 and 0167, requesting, *inter alia*, that UBS employ an aggressive investment strategy for the account, and that the base currency to measure the account's investment performance over time would be U.S. dollars.  See Doc. 1, at ¶¶ 38 and 48.  Moreover, with regard to UBS Account Nos. 0118 and 0167, Richard signed waivers, directing that the accounts not invest in U.S. securities so that he could avoid the withholding of U.S. taxes, as required by Treasury regulations.  See Doc. 1, at ¶¶ 34, 47 and 49.

**4.   Richard Kramer Did Not Disclose His Interests in the Foreign Financial Accounts on Timely-Filed FBARS or Income Tax Returns**.

Because the aggregate balance of Richard's foreign financial accounts, including UBS Account Nos. 0118, 0167 and 1253 and Julius Baer Account No. 2669, exceeded $10,000 during the calendar years 2006, 2007 and 2008, Richard was required to file timely FBARS on June 30, 2007, 2008 and 2009, respectively, reporting his interest in those accounts for those years.  See Doc. 1, at ¶¶ 29-66; pp. 3-6, *supra.*  Richard did not file timely FBARs for 2006, 2007 and 2008. See Doc. 1, at ¶ 67.  Indeed, he filed no FBARs for 2006 and 2007, and a delinquent and incomplete FBAR for 2008.  See Doc. 1, at ¶¶ 67-68.  Richard's untimely FBAR for 2008 reported only his interest in UBS Account No. 1253, the funds that Kramer Corp. had previously disclosed to the U.S. authorities.  See Doc. 1, at ¶¶ 67-68.  Accordingly, Richard's 2008 FBAR did not report his interests in UBS Account Nos. 0118 and 0167 and Julius Bar Account No. 2669.  See Doc. 1, at ¶ 68.

Not only did Richard fail to file timely FBARs, but he also failed to file timely income tax returns (Forms 1040).  See Doc. 1, at ¶¶ 70-71.  Nor did he timely disclose his interest in the UBS and Julius Baer accounts on his income tax returns.  See Doc. 1, at ¶¶ 70-78; discussion at p. 8,

*infra*.  Nor did he disclose the existence of all of his foreign financial accounts to his tax preparer so that the preparer could prepare accurate FBARs and income tax returns for 2006, 2007 and 2008.  See Doc. 1, at ¶¶ 51, 69 and 72-74.

On his delinquent income tax returns, Richard did not report all the income that he received from his foreign accounts, although he did report income from the UBS Account No. 1253, which was funded with assets that Kramer Corp. had previously disclosed to the U.S. authorities.  See Doc. 1, at ¶¶ 70-75 and 78.  Additionally, on Schedule B of Richard's late-filed returns for 2005, 2006 and 2007, he answered *"no"* to the question asking whether he had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  See Doc. 1, at ¶ 76.  The Schedule B filed with Richard's returns directed him to consult the instructions of Form TD F 90-22.1 in order that he could determine if the FBAR filing requirements applied to him for those calendar years.  See Doc. 1, at ¶ 77.

On Schedule B of Richard's untimely filed original return for 2008 and his amended returns for 2007 and 2008, he checked *"yes"* to the box, requesting whether he had "an interest in or a signature or other authority over a financial account in a foreign country."  See Doc. 1, at ¶ 78.  Although he checked "yes" to the Schedule B question, he failed to report all income that he received from those accounts during 2007 and 2008.  See Doc. 1, at ¶¶ 72-75 and 78.  Moreover, he failed to file FBARs that disclosed his interest in all foreign financial accounts in 2007 and 2008.  See Doc. 1, at ¶¶ 65-68 and 78; p. 7, *supra*.

5.   **FBAR Penalty Assessments Against Richard Kramer for 2006, 2007 and 2008.**

After Richard filed his amended returns for 2007 and 2008, the IRS conducted an examination of his income tax returns for 2004 through 2008.  See Doc. 1, at ¶ 79.  Based on that examination, the IRS proposed an assessment of income taxes against Richard for those years, including an assessment of civil fraud penalties for his failure to report the income from his foreign

accounts.  See Doc. 1, at ¶ 79.  During the IRS examination, Internal Revenue Agent Jeffrey Wiese ("Agent Wiese") reviewed certain records that UBS provided pursuant to an income tax treaty, and those records indicate that the aggregate balances of Richard's foreign financial accounts for 2006, 2007 and 2008 equaled $2,440,179, $1,686,648, and $1,302,636 as of the FBAR filing dates of June 30, 2007, 2008 and 2009, respectively.  See Doc. 1, at ¶¶ 41, 53, 57, 63 and 83; Exhibit "1" for the Declaration of Internal Revenue Agent Jeffrey Wiese ("Decl. Wiese"), including accompanying Exhibit "A," attached hereto and incorporated herein, at ¶¶ 3-6.  Upon completing the IRS examination, Agent Wiese determined that Richard had failed to report his interests in the UBS and Julius Baer accounts on timely filed FBARs for 2006, 2007 and 2008, and that his failure to file FBARs by the prescribed filing dates was willful.  See Doc. 1, at ¶¶ 84-91; Decl. Wiese, at ¶¶ 3 and 7-9.

Section 5321(a)(5) of Title 31 U.S.C. provides for the imposition of civil penalties on any person who fails to comply with the FBAR reporting requirements under 31 U.S.C. § 5314.  In the case of any person who willfully violates the FBAR reporting requirements, *inter alia*, by failing to file a timely FBAR, the maximum amount of the penalty that may be assessed for such violation is the greater of: *(i)* $100,000; or *(ii)* 50% of the balance in the account at the time of the violation. See 31 U.S.C. § 5321(a)(5)(C), (D).  Applying the above statutory rules here, the maximum penalty amount that the IRS could have assessed against Richard for willfully failing to file timely FBARs for 2006, 2007 and 2008 was $3,081,338.  See Doc. 1, at ¶¶ 83-84.  Although the statute establishes the maximum penalty amount that the IRS may assess for a willful FBAR violation, it also grants the IRS the discretion to reduce the penalty if circumstances warrant such a reduction. See 31 U.S.C. § 5321(a)(5); Doc. 1, at ¶ 85.  In this case, the IRS exercised its discretion and limited the amount of the FBAR penalty assessed against Richard for 2006 through 2008 to 50% of the balance of UBS Account No. 0167 on June 30, 2008 ($1,686,528), the due date for filing the FBAR for the calendar year 2007.  See Doc. 1, at ¶¶ 83-87.  Accordingly, the IRS, in its discretion,

reduced the FBAR penalty from $3,081,338 to $843,264, and allocated the penalty to 2006, 2007 and 2008 in equal amounts. <u>See</u> Doc. 1, at ¶¶ 83-87; Decl. Wiese, at ¶ 8.

By letter dated March 13, 2014, Paul Brusseau, Group Manager, advised Richard of the IRS's intent to assess an FBAR penalty of $843,264 against him under 31 U.S.C. § 5321(a)(5) for willfully failing to meet the filing requirements of 31 U.S.C. § 5314 for 2006, 2007 and 2008. <u>See</u> Doc. 1, at ¶ 87; Decl. Wiese, at ¶¶ 8-9 and Exh. A. By letters dated April 3 and 22, 2014, Richard, by and through his representative, requested a conference with IRS Appeals to protest the FBAR penalty. <u>See</u> Doc. 1, at ¶ 88. On April 25, 2015, an appeals conference was held. <u>See</u> Doc. 1, at ¶ 89. By letter dated November 4, 2016, Kristi A.Schanks, Appeals Team Manager, advised Richard, by and through his representative, that IRS Appeals sustained the proposed FBAR penalty assessments for 2006 through 2008. <u>See</u> Doc. 1, at ¶ 90.

On October 28, 2016, a delegate of the Secretary of Treasury, assessed the FBAR penalties against Richard, gave him notice of the assessments and made demand for their payment. <u>See</u> Doc. 1, at ¶¶ 87 and 91-92. Although notices of the assessments have been given and demand for their payment has been made, neither Richard nor his estate has paid the FBAR penalty assessments. <u>See</u> Doc. 1, at  ¶ 93. <u>See</u> <u>also</u>, Doc. 15, at ¶¶ 6-7; Decl. Murphy, at ¶¶ 9-10; Supp. Decl. Murphy, at ¶ 5. As of August 27, 2019, there is due and owing from Richard (and his estate), after application of any credits and payments, the sum of $1,010,322.68 for the unpaid balance of the FBAR penalties assessed against him under 31 U.S.C. § 5321(a)(5), including interest and failure to pay penalties under 31 U.S.C. § 3717, for the calendar years 2006, 2007 and 2008, plus interest and other additional amounts that have accrued and continue to accrue, as provided by law, from August 27, 2019 until paid. <u>See</u> Doc. 1, at ¶¶ 93-94; Exhibit "2" for the Declaration of Debt executed by the FBAR Penalty Coordinator, Onisha Y. Darnell ("Decl. Darnell") attached hereto and incorporated herein, at ¶¶ 3-5. <u>See</u> <u>also</u>, Doc. 15, at ¶ 7; Decl. Murphy, at ¶ 10; Supp. Decl. Murphy, at ¶¶ 3 and 5. Because neither Richard nor his estate has paid the FBAR penalty assessments, the United States is entitled to entry of a judgment for the unpaid balance of the

assessments, including any accruals thereon.  See Doc. 1, at pp. 19-20; p. 11, *infra*.  See also, Doc.

15, at ¶¶ 1-8; Decl. Murphy, at ¶¶ 4-11; Supp. Decl. Murphy, at ¶¶ 1-2 and 6.

**B.  PROCEDURAL HISTORY.**

**1.  Don Kramer Was Personally Served With the Summons and Complaint.**

On February 18, 2017, Richard died intestate and without any unrevoked wills or codicils,

and survived by his two brothers, Don and Harold Kramer.[3]  See Doc. 1, at ¶¶ 5 and 7.  There are

no pending probate proceedings with regard to the Estate of Richard Kramer.  See Doc. 1, at ¶ 6.

Nor has a personal representative been appointed to act on behalf of the estate.  See Doc. 1, at ¶ 6.

In view of the above, Don is an heir to the intestate estate of Richard Kramer under Florida law

(*see* Fla. Stat. Ann. §§ 732.101, 732.103), he may receive or may have received distributions of

Richard's property, and he could potentially serve as a personal representative of the Estate of

Richard Kramer (*see* Fla. Stat. Ann. § 733.301, *et seq.*).  See Doc. 1, at ¶ 7.  For these reasons, Don

was named as a defendant in this action.

On October 26, 2018, the United States filed a complaint, *inter alia*, against Don, in his

capacity as a potential heir and/or personal representative of Richard's estate and/or a distributee of

Richard's property, seeking to reduce to judgment the unpaid civil penalties that were assessed

against Richard, for his willful failure to report his interest in certain foreign financial accounts for

the calendar years 2006, 2007 and 2008 timely, plus interest, failure to pay penalties and other

additional amounts that have accrued and continue to accrue, as provided by law, from the date of

---

[3]    In addition to naming Don as a defendant in the complaint, the United States also named Harold
Kramer and John Doe and Jane Doe, as unknown persons that may qualify as potential heirs and/or
personal representatives of Richard's estate and/or distributees of his property.  See Doc. 1, at
¶¶ 5-10; Supp. Decl. Murphy, at ¶ 23, n. 1.  The United States voluntarily dismissed Harold
Kramer from these proceedings on August 2, 2019.  See Doc. 37.  To date the United States has
not identified any additional persons that must be joined or otherwise named as defendants
in this action.  Accordingly, the United States is filing a Notice of Voluntary Dismissal
contemporaneously with the filing of this motion, dismissing John Doe and Jane Doe from these
proceedings effective upon entry of a final judgment against Don.

assessment until paid.  See Doc. 1, at ¶¶ 1, 4-9 and 11-95; Doc. 15, at ¶¶ 1-8; Decl. Murphy, at ¶¶ 4-11; Supp. Decl. Murphy, at ¶¶ 2-4.

By letter dated November 23, 2018, the United States attempted to serve Don with the complaint, via federal express, and requested that he waive service of a judicial summons, but he did not execute the waiver.  See Doc. 4; Doc. 15, at ¶¶ 9-11; Decl. Murphy, at ¶¶ 12-14 and Exhs. 1-3; Supp. Decl. Murphy, at ¶ 8.  On February 9, 2019, a process server personally served Don with the summons and a copy of the complaint at his residence located at 7093 Autumn Hill Drive, West Bloomfield, Michigan  48323.  See Doc. 13; Doc. 15, at ¶¶ 9-18; Decl. Murphy, at ¶¶ 12-21 and Exhs. 4-6; Supp. Decl. Murphy, at ¶ 9.

Don is not a minor, and service of the summons and complaint on him was proper under Rule 4(e) of the Federal Rules of Civil Procedure.  See Doc. 13; Doc. 15, at ¶ 19; Decl. Murphy, at ¶ 22; Supp. Decl. Murphy, at ¶ 10.  Don is not an active member of the military.  See Supp. Decl. Murphy, at ¶ 12 and Exh. 11.  Based on a telephone conference the undersigned counsel had with Don on December 18, 2018 and a review of his motions, seeking to set aside the prior default entered against him (*see* Docs. 20, 21 and 22), there does not appear to be any issue regarding his competency.  See Doc. 15, at ¶ 20; Decl. Murphy, at ¶ 23; Supp. Decl. Murphy, at ¶ 11; pp. 12-13, *infra*.

**2.   Don Kramer Has Not Answered or Otherwise Responded to the Complaint.**

Under the Federal Rules of Civil Procedure, Don was required to file an answer or otherwise plead to the United States' complaint by March 4, 2019, but he did not do so.  See e.g., Fed. R. Civ. P. 12(a)(1)(A)(i).  See also, Doc. 15, at ¶ 21; Decl. Murphy, at ¶ 24; Supp. Decl. Murphy, at ¶ 13.  On March 29, 2019, the United States filed an application for entry of default against Don, and the Clerk of Court entered a default against him on April 1, 2019.  See Doc. 15, including Decl. Murphy and Exhs. 1-10; Doc. 17; Supp. Decl. Murphy, at ¶¶ 14-16.  On April 26, 2019, Don filed a number of motions, seeking, in pertinent part, for the Court to set aside the Clerk of Court's entry of default against him.  See Docs. 20, 21 and 22; Supp. Decl. Murphy, at ¶ 17.  On

12

May 10, 2019, the United States opposed Don's motions.  See Doc. 25; Supp. Decl. Murphy, at ¶ 18.

By Order entered on June 13, 2019, the Court denied Don's request to set aside the default entered against him and ordered, in pertinent part, that he answer the United States' complaint by June 26, 2019.  See Doc. 31, at pp. 1 and 3-4; Supp. Decl. Murphy, at ¶ 19.  The Court also stated that if Don failed to answer the complaint by the June 26th deadline, the United States may renew its application for entry of default against him.  See Doc. 31, at p. 4; Supp. Decl. Murphy, at ¶ 19.  By Order entered on August 5, 2019, the Court ordered the United States to renew its application for entry of default against Don.  See Doc. 39, at p. 1.

On August 15, 2019, the United States renewed it application for entry of Don's default.  See Doc. 43; Supp. Decl. Murphy, at ¶¶ 20-23 and Exhs. 12-13.  On August 16, 2019, the Clerk of Court entered a default against Don.  See Doc. 44.  By Order of August 16, 2019, the Court ordered the United States to move for entry of a default judgment against Don.  See Doc. 45.  As the record establishes, Don has not answered or otherwise responded to the United States' complaint.  Accordingly, as directed by the Court, the United States requests entry of a default judgment against Don.

## II.  LEGAL STANDARD FOR DEFAULT JUDGMENTS.

Although the Eleventh Circuit has "a strong policy of determining cases on their merits and . . . therefore views defaults with disfavor," the law is well settled that a "district court has the authority to enter [a] default judgment for failure . . . to comply with its orders or rules of procedure."  See e.g., United States v. Poole, 2017 WL 6731718, at *1 (S.D. Ala. Dec. 28, 2017) (quoting, In re Worldwide Web Systems, Inc., 328 F.3d 1291, 1295 (11th Cir. 2003); Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985) (other citation omitted)).  Indeed, Rule 55 of the Federal Rules of Civil Procedure expressly provides for entry of default and a default judgment where a defendant "has failed to plead or otherwise defend."  See Poole, 2017 WL 6731718, at *2 (quoting, Fed. R. Civ. P. 55(a)).  Additionally, "[i]n a variety of contexts, courts have entered

default judgments against defendants who have failed to appear and defend in a timely manner following proper service of process." See Poole, 2017 WL 6731718, at *2, n. 1 (citations omitted). Thus, "while modern courts do not favor default judgments, they are certainly appropriate when the adversary process has been halted because of an essentially unresponsive party." See Poole, 2017 WL 6731718, at *2, n. 2 (quoting, Flynn v. Angelucci Bros. & Sons, Inc., 448 F.Supp.2d 193, 195 (D.D.C. 2006) (other citations omitted)).

Although authorized to enter a default judgment under Rule 55(b)(2), the district court, before doing so, "must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." See United States v. Brandt, 2018 WL 1121466, at *2 (S.D. Fla. Jan. 24, 2018) (quoting, Tyco Fire & Sec., LLC v. Alcocer, 218 Fed.Appx. 860, 863 (11th Cir. 2007)); Poole, 2017 WL 6731718, at *3 ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact[s] in the complaint]") (citations omitted)).  In other words, a "default judgment cannot stand on a complaint that fails to state a claim." See Brandt, 2018 WL 1121466, at *2 (quoting, Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1370, n. 41 (11th Cir. 1997)).

If the district court determines that the complaint states a claim, "[d]amages may be awarded only if the record adequately reflects the basis for award via 'a hearing or a demonstration by detailed affidavits establishing the necessary facts.'" See Brandt, 2018 WL 1121466, at *3 (citing, Adolph Coors Co. v. Movement Against Racism and the Klan, 777 F.2d 1538, 1543-1544 (11th Cir. 1985) (quoting, United Artists Corp. v. Freeman, 605 F.2d 854, 857 (5th Cir. 1979); Fed. R. Civ. P. 55(b)(2)).  Accordingly, "[w]hile well-pleaded facts in the complaint are deemed admitted, plaintiff['s] allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages, . . . [and] that there is a legitimate basis for any damage award it enters." See Poole, 2017 WL 6731718, at *3 (quoting, Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003) (internal

14

quotations and other citations omitted)).  An evidentiary hearing is not necessary "to fix damages" so long as the Court ensures that there is an adequate basis for the damages awarded (<u>e.g.</u>, plaintiff's declarations, calculations and/or other documentation of damages).  <u>See e.g.</u>, <u>Poole</u>, 2017 WL 6731718, at *3, n. 3 (citations omitted).  <u>See also</u>, <u>Anon Consulting, Inc. v. Bionitrogen Holdings Corp.</u>, 650 Fed.Appx. 729, 733 (11th Cir. May 27, 2016) (When the amount of plaintiff's damages is a liquidated sum or an amount capable of mathematical calculation, an evidentiary hearing is not necessary).

### III. <u>THE UNITED STATES IS ENTITLED TO ENTRY OF A DEFAULT JUDGMENT AGAINST THE DEFENDANT DORON A/K/A DON KRAMER.</u>

Applying the above legal standards to the facts here, entry of a default judgment against Don is justified.  Despite having been personally served with the summons and complaint more than six months ago, and having been given ample notice of the deadline(s) for the filing of a responsive pleading and that default proceedings are underway, Don has elected not to participate or otherwise defend himself in this action.  Don's failure to respond to the complaint has unnecessarily stalled the litigation of this case.  Because Don has failed to answer the United States' complaint, "despite actual notice of this lawsuit, the deadline[s] for filing a responsive pleading, the default[s] entered against him, and the [United States'] effort to obtain a default judgment against him, he is entitled to no further notice or opportunities to be heard at this time," and the entry of a default judgment against him is warranted.  <u>See</u> <u>Poole</u>, 2017 WL 6731718, at *2, n. 2.

Here, a review of the complaint, along with the applicable law, confirms that the United States has alleged specific and detailed facts that state a cognizable claim for relief against Don, for the unpaid balance of Richard's FBAR penalty assessments for 2006, 2007 and 2008.  Section 5321(a)(5) of Title 31 U.S.C. provides for the imposition of civil penalties on any person who fails to comply with the FBAR reporting requirements under 31 U.S.C. § 5314.  In the case of any person who willfully violates the FBAR reporting requirements, *inter alia*, by failing to file a

timely FBAR, disclosing the existence of a foreign financial account or any identifying information required to be disclosed with regard to said account, the maximum amount of the penalty that may be assessed for such violation is the greater of: *(i)* $100,000; or *(ii)* 50% of the balance in the account at the time of the violation.  See 31 U.S.C. § 5321(a)(5)(C), (D).  To establish a person's liability for a willful FBAR violation, the following elements under 31 U.S.C. § 5321 must be met during the years at issue:  *(1)* the person must be a U.S. citizen; *(2)* the person must have or had a financial interest in, or signatory or other authority over, a bank, securities or other financial account; *(3)* the account had a balance exceeding $10,000 at some time during the reporting period; *(4)* the account was in a foreign country; *(5)* the person failed to disclose the account; *(6)* the failure was willful; and *(7)* the amount of the penalties were proper.  See Brandt, 2018 WL 1121466, at *3 (citing, 31 U.S.C. § 5321; United States v. McBride, 908 F.Supp. 2d 1186, 1202-1214 (D. Utah Nov. 8, 2012)).

Applying the above legal principles to the well-pleaded facts alleged in the complaint, the United States has established a *prima facie* case that Richard knew that he had a legal duty to file timely FBARs for 2006, 2007 and 2008, and despite having that knowledge, he willfully failed to file FBARs for each of those calendar years by the prescribed filing dates.  See Brandt, 2018 WL 1121466, at *4.  First, Richard was a U.S. citizen prior to his death in February 2017.  See Doc. 1, at ¶¶ 4-5.  Second, during the relevant periods, he was the beneficial owner of and had a financial interest in four foreign accounts, three at UBS and one at Julian Baer.  See Doc. 1, at ¶¶ 29-64. Third, the aggregate balance of Richard's foreign financial accounts exceeded $10,000 during each reporting period.  See Doc. 1, at ¶¶ 29-64.  Fourth, Richard was required to disclose his financial interests in the foreign accounts by timely filing FBARs for 2006, 2007 and 2008 on June 30, 2007, 2008 and 2009, respectively, but he did not do so.  See Doc. 1, at ¶¶ 29-67.  Indeed, he filed no FBARs for 2006 and 2007, and a delinquent and incomplete FBAR for 2008, disclosing only his interest in UBS Account No. 1253, the assets of which Kramer Corp. had already disclosed to the U.S. authorities.  See Doc. 1, at ¶¶ 67-68.

16

The United States' complaint further establishes that Richard's failure to file timely FBARs for 2006, 2007 and 2008 was willful.  In the context of an FBAR violation, "[w]illfulness does not require actual knowledge of the duty to report [an] interest in a foreign financial account, but merely reckless or careless disregard of that statutory duty."  See Brandt, 2018 WL 1121466, at *4 (citing, United States v. Williams, 489 Fed.Appx. 655, 658 (4th Cir. 2012); McBride, 908 F.Supp.2d at 1204-1205, 1209-1210).  "While the term 'recklessness' is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard; action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."  See United States v. Schwarzbaum, 2019 WL 3997132, at *3 (S.D. Fla. Aug. 23, 2019) (citing, Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 68 (2007) (quoting, Farmer v. Brennan, 511 U.S. 825, 836 (1994) (internal quotations omitted)).

Additionally, in the case of an FBAR violation, "[w]illfulness may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information," and it "can be inferred from a conscious effort to avoid learning about reporting requirements."  See Williams, 489 Fed.Appx. at 658 (quoting, United States v. Sturman, 951 F.2d 1466, 1476 (6th Cir. 1991) (internal citations omitted)).  Further, circumstantial evidence and reasonable inferences drawn by a court based on the record suffice because "direct proof of a taxpayer's intent is rarely available."  See McBride, 908 F.Supp.2d at 1205 (citations omitted).  For instance, it is highly unlikely that persons who fail to file FBARs will admit that they knew of the filing requirements, and chose not to comply with them.

Here, not only did Richard fail to report his interests in the foreign accounts on timely FBARs for 2006, 2007 and 2008, he also failed to disclose those accounts on his late-filed income tax returns (Forms 1040) for those years.  See Doc. 1, at ¶¶ 70-78.  Nor did he disclose the accounts to his tax preparer, resulting in the preparation and the filing of inaccurate returns.  See Doc. 1, at ¶¶ 51, 69 and 72-74.  Nor did he report all the income that he earned from the foreign accounts.  See Doc. 1, at ¶¶ 70-75 and 78.  Indeed, on Schedule B of the delinquent returns that he filed for

17

2005, 2006 and 2007, he answered *"no"* to the question asking whether he had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account." See Doc. 1, at ¶ 76.  Moreover, the Schedule B directed him to consult the instructions of Form TD F 90-22.1 to determine if the filing of an FBAR was necessary to disclose his financial interest in the foreign accounts.  See Doc. 1, at ¶ 77. Despite having been put on notice of his FBAR filing requirements, Richard chose to ignore them. See Doc. 1, at ¶¶ 65-68 and 78.

By law, "[t]axpayers are charged with constructive knowledge of and responsibility for the contents of their tax returns, which are signed under penalty of perjury."  See Brandt, 2018 WL 1121466, at *4 (citing, Williams, 489 Fed.Appx. at 659; McBride, 908 F.Supp.2d at 1205-1214). As the Williams court observed, "[A taxpayer's] signature is prima facie evidence that he knew the contents of the return, and at a minimum line 7a's directions to '[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1' put [the taxpayer] on inquiry notice of the FBAR requirement."  See Brandt, 2018 WL 1121466, at *4 (quoting, Williams, 489 Fed.Appx. at 659 (quoting, Form 1040)).  Willful blindness, a form of recklessness, may be inferred when a defendant consciously chooses to avoid learning about reporting requirements.  See Williams, 489 Fed.Appx. at 658-659 (citations omitted).

In addition to the untimely disclosures identified, above, Richard, by and through his management of the account, attempted to conceal his ownership of, and financial interests, in the foreign accounts.  He established and maintained "numbered" accounts, rather than "named" accounts.  See Doc. 1, at ¶¶ 36, 50 and 61.  He arranged for UBS and Julian Baer to retain his account statements and correspondence for a fee.  See Doc. 1, at ¶¶ 32, 45 and 60.  He executed written waivers of his right to invest in U.S. securities to ensure UBS would not disclose the existence of his accounts to the U.S. authorities.  See Doc. 1, at ¶¶ 34, 47 and 49.  See also Brandt, 2018 WL 1121466, at *4.  Also, when he did file the delinquent FBAR for 2008, he disclosed only his interest in UBS Account No. 1253, the assets of which had been previously disclosed by

18

Kramer Corp. to the U.S. authorities.  See Doc. 1, at ¶¶ 67-68.  This selective disclosure suggests that he was aware of the FBAR filing requirements, but consciously chose not to disclose his interests in the other foreign accounts.

The circumstantial evidence, above, is sufficient to find that Richard willfully failed to file timely FBARs for 2006, 2007 and 2008.  He made a conscious effort to conceal his foreign financial accounts and avoid learning about his FBAR reporting obligations.  In view of the above, the factual allegations of the well-pleaded complaint are sufficient to establish the FBAR penalty assessments against Richard (and his estate) are appropriate.  Further, given that all of the well-pleaded factual allegations in the complaint are deemed admitted by virtue of Don's default, and because the allegations are sufficient to state a claim for relief against him, the United States has established Don's liability, and as a consequence, entry of a default judgment against him is appropriate.

Finally, the United States' "evidentiary showing is adequate to support its entitlement to damages in the amounts requested."  See Poole, 2017 WL 6731718, at *4.  The complaint, together with the Declaration of Debt executed by the FBAR Penalty Coordinator, Onisha Y. Darnell, provides a sufficient basis for the Court to determine that the amount of the penalties assessed against Richard is proper.  See Brandt, 2018 WL 1121466, at *4.  See also, Doc. 1 and Decl. Darnell.  The complaint provides a detailed explanation of the method by which the IRS calculated the FBAR penalties assessed against Richard for willfully failing to file timely FBARs for the years at issue.  See Doc. 1, at ¶¶ 81-94.  Further, after accessing and reviewing the official IRS records documenting the current balance of Richard's unpaid FBAR penalty assessments, Darnell, by and through her declaration, establishes the precise amount owed by Richard and his estate as of August 27, 2019, and states that Richard's unpaid FBAR penalties for the calendar years 2006, 2007 and 2008 equal $843,264.00, plus accrued failure to pay penalties of $143,193.16 and interest of $23,865.52, for a grand total of $1,010,322.68 as of August 27, 2019.  See Decl. Darnell, at ¶¶ 3-5.

Where, as here, the damages sought to be awarded can be ascertained from definite figures contained in documentary evidence or detailed affidavits, a default judgment may be entered without an evidentiary hearing.  See e.g., Anon Consulting, 650 Fed.Appx. at 733; Poole, 2017 WL 6731718, at *3, n. 3.  Accordingly, because neither Richard nor his estate has paid the FBAR penalty assessments and the United States has provided a sufficient evidentiary basis for entry of a default judgment against Don, the Court should grant the United States' motion and, in accordance with Fed. R. Civ. P. 55(b)(2), enter a default judgment in favor of the United States and against the defendant, Doron a/k/a Don Kramer, for the balance due as of August 27, 2019, plus interest, late-payment penalties and other additional amounts accruing thereafter until paid.

## IV.  CONCLUSION.

For the reasons described, above, the Court should enter a default judgment against the defendant, Doron a/k/a Don Kramer, in this action as authorized by Fed. R. Civ. P. 55(b)(2).  A proposed order and proposed default judgment are attached hereto and will be sent, via e-mail, to the Judge's Chambers.

Respectfully submitted this 6th day of September, 2019.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

/s/ Lynne M. Murphy
LYNNE M. MURPHY
Trial Attorney, Tax Division
U.S. Department of Justice
La. Bar No. 20465
D.C. Bar No. 485928
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 514-5881
Facsimile:   (202) 514-9868
E-mail:      lynne.m.murphy@usdoj.gov

20

OF COUNSEL:

ARIANA FAJARDO ORSHAN
United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

**IT IS HEREBY CERTIFIED** that service of the foregoing United States of America's Motion for Entry of a Default Judgment Against the Defendant, Doron a/k/a Don Kramer, including the accompanying Declaration of Internal Revenue Agent Jeffrey Wiese, Declaration of Debt executed by the FBAR Penalty Coordinator, Onisha Y. Darnell, Proposed Order and Proposed Default Judgment, has this 6th day of September 2019, been made by sending a copy thereof, **VIA FEDERAL EXPRESS**, to the following person at the following address:

> Doron a/k/a Don Kramer
> 7093 Autumn Hill Drive
> West Bloomfield, Michigan  48323

> /s/ Lynne M. Murphy_____
> Trial Attorney, Tax Division
> U.S. Department of Justice
> P.O. Box 14198
> Ben Franklin Station
> Washington, D.C.  20044

17855313.1